# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| JEREMIAH STONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 2:14-CV-287 |
| | ) | |
| PORTER COUNTY SHERIFF'S | ) | |
| DEPARTMENT, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION AND ORDER</u>

This matter is before the Court on Defendants' Motion for Summary Judgment, filed on September 22, 1016 (DE #27). For the reasons set forth below, the motion is **GRANTED IN PART** and **DENIED IN PART.** Summary judgment is **DENIED** on Jeremiah Stone's excessive force claim against Officer Gill to the extent that it alleges that allowing the canine to continue attacking him following his apprehension constituted excessive force, and it is **DENIED** on his failure to intervene claim against Officers Brockman and Boone. Summary judgment is **GRANTED** as to all other claims.

<u>BACKGROUND</u>

On August 15, 2014, Plaintiff Jeremiah Stone ("Stone") filed a complaint against the Porter County Sheriff's Department ("Sheriff's Department"), Sheriff David Lain ("Sheriff Lain"), Officer Brian Gill ("Officer Gill"), Officer Meredith Brockman

("Officer Brockman"), and Officer Matthew Boone ("Officer Boone"). The complaint stems from an incident on August 15, 2012. The vehicle Stone was traveling in was pulled over. Stone fled and Officer Gill directed his canine, Dolar, to apprehend him. Stone was injured during the apprehension, and alleges that the dog was permitted to continue attacking him after he was secured.

Stone alleges that his Fourth and Fourteenth Amendment rights were violated by the Defendants' use of excessive force, in violation of 42 U.S.C. § 1983. He additionally alleges that his Fourteenth Amendment due process rights were violated. And, he seeks a declaratory judgment that Sheriff Lain and the Sheriff's Department utilize unconstitutional policies and procedures for the use and deployment of canines. The instant motion is fully briefed and ripe for adjudication.

DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Facts

Defendants have provided a "Statement of Undisputed Material Facts" with citations to supporting evidence in compliance with the requirements of Federal Rule of Civil Procedure 56 and Northern District of Indiana Local Rule 56-1. Accordingly, to avoid summary

judgment, Stone must demonstrate that there is a genuine dispute by citing material facts he contends are in dispute in a section labeled "Statement of Genuine Disputes" or showing that the materials cited by the Defendants do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c).

Stone's statement of genuine disputes contains facts that Stone alleges are in dispute, but many of the citations point to evidence that is not before the Court. For example, this Court does not have before it pages 56, 65, or 88 of Officer Gill's deposition, page 21 of Officer Boone's deposition, or pages 43-44 of Officer Brockman's deposition. Other facts asserted in the statement of genuine disputes are not supported by any citation. Still other portions misconstrue the evidence that is cited. And, portions of the statement of genuine disputes consist of argument rather than facts.

The Court will not consider any portion of either the Defendant's statement of material facts or Stone's statement of genuine disputes that does not properly cite to evidence in the record. The Court need not "credit [a party's] version of the facts when the materials supporting those asserted facts are not part of the record." *Stevens v. Housing Auth. of South Bend*, 663 F.3d 300, 311 (7th Cir. 2011). Nor is this Court required to hunt through the record to make a party's case for him. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702-03 (7th Cir. 2010)

-4-

(collecting cases). Therefore, as in *Gross*, this Court "strikes any of the parties' factual assertions, in any section of their briefs, that lack direct citation to easily identifiable support in the record." *Id.* Because the Defendants' statement of undisputed material facts is well-supported and most of the facts contained in it are undisputed, the Court has borrowed liberally from it.

In the early morning hours of August 15, 2012, Stone was traveling eastbound in a maroon Dodge Stratus on U.S. Highway 6 in Porter County, Indiana. (Def. Ex. B at 8-9). After observing the Stratus cross left of center twice, Officer Brockman initiated a traffic stop on suspicion of intoxication. (Def. Ex. B at 10). When Officer Brockman initiated the traffic stop, Stone advised the other two occupants of the vehicle, Michelle Sabich and Sarah Myers, that he would run if the car was pulled over because he was on probation in another county and could go to jail for drinking that night. (Def. Ex. C at 30).[1] When the car stopped, Stone immediately exited the vehicle from the driver's side and ran. (Def. Ex. B at 15). Officer Brockman began to run after Stone, but he escaped. (*Id.*). She returned to the vehicle and spoke with Sabich and Myers. (Def. Ex. B at 19). They advised Officer Brockman that Stone told them he would run if they were pulled over. (*Id. at* 21).

---

[1] Defendants note that Stone was on probation for felony residential entry and theft. (Def. Ex. C at 8). This was unknown to the officers at the time Stone was apprehended and is irrelevant to the issues before this Court.

Officers Gill, his canine Dolar, and Officer Boone then arrived to assist with the search for Stone. (Def. Ex. D at 14; Def. Ex. E at 61). Officer Boone attempted to chase Stone, yelling out to stop and that he was the police, but Stone continued to run. (Def. Ex. D at 17-18). Officer Boone did not know whether Stone was armed, but he believed it was a dangerous situation because Stone seemed desperate to get away from the police. (Def. Ex. D at 33-34). Stone was running through a trailer park, where there are many places to hide and it is very easy to break in to homes. (Ex. D at 34). The officers had no reason to believe Stone would stop running if Dolar had not apprehended him. (Def. Ex. D at 34).

Officer Gill has been a canine handler since 2009. (Def. Ex. F at 1). He obtained his canine, Dolar, from Faus Canine Specialties in Elkhart. (Def. Ex. E at 24). He attended a five-week course with Dolar, and they were certified as a team through the National Police Working Dog Association ("NPWDA"). (*Id.*). He and Dolar recertified through NPWDA every September. (*Id.* at 21). They also trained monthly with other canine handlers in Northwest Indiana on tracking, narcotics detection, obedience, aggression control, and all of the NPWDA standards. (*Id.* at 14-15).

Officer Gill was subject to and guided by the Sheriff's Department's use of force policy in effect at the time of Stone's arrest. (Def. Ex. E at 10). He understands that Dolar is

considered an instrumentality of force as an intermediate weapon in accordance with the Sheriff's Department policy on the use of force. (Def. Ex. E at 8-10; Ex. G). The policy provides in part as follows:

> 1. This policy establishes guidelines for the Department concerning the use of force. It shall be the policy of this Department to use only that degree of force that is reasonable and necessary to perform official duties.
>
> 2. Officers shall not strike or use physical force against any person except when necessary in self-defense, in defense of another, to overcome physical resistance to lawful commands, or to prevent the escape of an arrested person.

(Def. Ex. G at 1).

Intermediate weapons are non-deadly weapons such as tasers, chemical spray, or mace. (Def. Ex. E at 3). The canine policy provides that "[t]he handler shall allow the canine to use only that level of force [that] is reasonably believed to be necessary to apprehend or secure a suspect." (Def. Ex. E at 17; Ex. H ¶ J). The same standard applies to the use of force regardless of the mechanism of force. (Def. Ex. E at 97). Releasing Dolar is not considered the use of deadly force. (Def. Ex. E at 12). Officer Gill knows this from his training and experience. (Def. Ex. E at 8). The Sheriff's Department uses a "one plus one" model of force. (Def. Ex. E at 10). That means that they are able to take the level of force used up one level from what the subject is displaying. (Def. Ex. E at 11). Stone's resistance would be

considered defensive resistance. (Def. Ex. E at 11).

The use of force policy requires officers to fill out a use of force form. (Def. Ex. E at 10). Officer Gill did not fill out the required form for the use of force against Stone. (*Id.* at 9-10). He has never filled out the use of force form when Dolar has apprehended a subject. (*Id.*).

Other than the instant case, Officer Gill has never had a complaint about any action taken by him and Dolar. (Def. Ex. E at 32, 98). Officer Gill has no knowledge of any other complaints regarding canine bites with the Sheriff's Department. (Def. Ex. E at 102). He has also never been disciplined for any action taken by him and Dolar. (Def. Ex. E at 32). Each canine bite is reviewed by the head of the canine division, and Officer Gill was not disciplined for Dolar's apprehension of Stone in this incident. (Def. Ex. E at 33, 38, 98). Nobody said or suggested that Dolar's apprehension of Stone was an inappropriate use of force. (Def. Ex. E at 38).

The first time that Officer Gill and Dolar located Stone, Officer Gill called out for Stone to stop, but Stone jumped over a fence and continued running. (Def. Ex. E at 61). In determining whether to release Dolar, Officer Gill considers factors such as the danger to the community, danger to the officers, the fact of a fleeing suspect, the nature of the crime, and population density. (Def. Ex. E at 39). His actions are the result of his experiences

in police work, and he considered the unpredictable nature of Stone's behavior and his desperation to get away from the police. (Def. Ex E at 70). In his almost ten years of police work, he has learned that a person desperate to escape the police poses a danger to the community. (Def. Ex. E at 70). Out of tens of thousands of traffic stops, a situation such as this has only happened two or three times. (Def. Ex. E at 70). This is, in Officer Gill's opinion, very abnormal behavior for someone who just had a few drinks and did not want to be caught by the police. (Def. Ex. E at 70). Someone that determined and desperate would have almost certainly ended up in a physical altercation. (Def. Ex. E at 11-12, 78). According to Officer Gill, when a suspect exhibits desperation such as what Stone exhibited, they either had a lot of liquor or they just committed a very serious crime. (Def. Ex. E at 82).

Officer Brockman did not know if Stone was carrying a weapon. (Def. Ex. B at 27). The assumption when someone runs from the police is that they pose a danger. (*Id.* at 27). She believed Stone posed a danger to society because he ran from police for an unknown reason, and they did not know his mindset. (*Id.* at 30). In pursuing Stone, Officer Brockman believed they were defending the public because Stone ran in a trailer park — a highly populated area. (*Id.* at 30-31). The police encountered two individuals, Harley Jewitt ("Jewitt") and Samantha Satrioano ("Satriano"),

delivering papers while searching for Stone. (Pl. Ex. 1 at 10, 15; Pl. Ex. 2 at 7-8, 15). They were stopped twice and asked if they had seen anyone in the area, but the officers did not indicate that the person they were looking for might be dangerous. (Pl. Ex. 1 at 16-19, 22; Pl. Ex. 2 at 14-15).

Officer Gill and Dolar located Stone a second time, and Officer Gill yelled for Stone to stop or he would release Dolar. (Def. Ex. D at 23; Def. Ex. E at 78). Stone continued to run. (Def. Ex. D at 25; Def. Ex. E at 78). In accordance with his training, Officer Gill issued the command for Dolar to apprehend Stone. (Def. Ex. E at 78). Dolar apprehended Stone mid-stride while he was attempting to continue running. (Def. Ex. D at 25; Ex. E at 79). According to the Defendants, Officer Gill placed Stone in handcuffs, released Dolar, and called for an ambulance, which arrived shortly thereafter. (Def. Ex. D at 29; Def. Ex. E at 92-93; Def. Ex. C at 41).

Stone presents a very different version of the events following his apprehension. According to Jewett, a witness, there were three squad cars and five officers surrounding Stone while he was laying on the ground face down with his hands cuffed behind his back "and the dog was tearing that guy up." (Pl. Ex. 1 at 22-24). Stone was unable to protect himself and was screaming "stop." (*Id.*). According to Jewett, "the handler let the dog just chew on him for about five minutes before he finally called it off." (*Id.*

at 25). Jewett recounts that the handler, Officer Gill, pulled the dog off Stone after he saw Jewett and made eye contact with him. (*Id.* at 25-26). Jewett estimates that he was 15-20 feet away while witnessing these events, and that the area was illuminated by a street light. (*Id.* at 28).

Satriano, the woman with Jewett, offers a similar version of events. She saw five officers surrounding Stone. (Pl. Ex. 2 at 17-20). Stone was on his belly with his hands and feet cuffed behind his back while the dog chewed on him for about five minutes. (*Id.*). She reports that the officers stood five feet away with their hands folded across their chests while the dog mauled Stone until they noticed they were being watched by herself and Jewett. (*Id.*). Stone was screaming for help while the dog was "going crazy" and biting Stone multiple times. (*Id.* 19-22).

No force other than Dolar was used in effectuating Stone's arrest. (Def. Ex. E at 104; Def. Ex. C at 41). In using Dolar to apprehend Stone, Officer Gill was pursuing the police interest in stopping any danger Stone posed. (Def. Ex. E at 103). It was Officer Gill's sole intention to apprehend Stone, not to harm him. (Def. Ex. E at 103). Officer Gill explained that sending his canine to apprehend a suspect is a last resort. (Def. Ex. E at 18, 59).

Stone does not contest that the officers had probable cause for his arrest. (Def. Ex. C at 20). There was no time when Stone

considered stopping and submitting to the officers. (Def. Ex. C at 31-32). He did not want the police to find him. (Def. Ex. C at 30).

Sheriff Lain had no involvement in Stone's arrest. (Def. Ex. E at 104). Stone has no knowledge of how a police canine is trained to apprehend a fleeing suspect. (Def. Ex. C at 19). Stone has no knowledge of Sheriff's Department policies. (Def. Ex. C at 39). He has no knowledge of any instances in which something like this happened to someone else. (Def. Ex. C at 39). He has no knowledge of prior complaints to the Sheriff's Department regarding dog bites. (Def. Ex. C at 40). He has no knowledge that any supervisors knew about any complaints. (Def. Ex. C at 40). He has no knowledge regarding Dolar's bite history. (Def. Ex. C at 40). He has no knowledge of the existing Sheriff's Department procedure to review dog bites. (Def. Ex. C at 40).

Stone agrees that if he had not run from the traffic stop, he would not have been apprehended by Dolar. (Def. Ex. C at 41). He does not believe that it is likely he will encounter police and be apprehended by a canine again. (Def. Ex. C at 41-42). He has no evidence that responsible police departments only train handlers and dogs to search and find suspects. (Def. Ex. C at 42). He relies only on his opinion. (Def. Ex. C at 42). He has no evidence that the Sheriff's Department trains its canines to attack suspects. (Def. Ex. C at 43). He has no evidence that the

-12-

Sheriff's Department fails to monitor the deployment of police dogs. (Def. Ex. C at 43). He has no knowledge of the system that the Sheriff's Department uses to track when there is a bite and the follow up that occurs. (Def. Ex. C at 43). He has no evidence of Sheriff Lain participating, approving of, or ratifying any of the events of the night of his arrest. (Def. Ex. C at 43). He has no knowledge of how many dog bites there have been with the Sheriff's Department canines. (Def. Ex. C at 44). He has no knowledge of any problems with Officer Gill. (Def. Ex. C at 44). He has no evidence that the Sheriff's Department employs dog handlers who are prone to use excessive force. (Def. Ex. C at 44).

On August 12, 2012, the Sheriff's Department had regulations about the use of force and the use of canines, and all officers were required to follow these regulations. (Def. Ex. G, H). The canine policy precluded any officer other than the canine handler from becoming involved in the use of a canine, except in an emergency. (Def. Ex. E at 103).

Officer Boone was present during the apprehension. (Def. Ex. D at 36; Ex. E at 104). According to both Officer Boone and Officer Gill, no emergency existed that would warrant Officer Boone becoming involved with the apprehension. (*Id.*). Further, Officer Boone viewed the use of force as reasonable. (Def. Ex. D at 36). Officer Brockman asserts that she was not present for Stone's apprehension, and she arrived after Dolar was removed. (Def. Ex.

B at 31). The testimony of Jewett and Satriano that five officers were present while Stone was handcuffed and being bitten casts some doubt on this assertion. (Pl. Ex. 1 at 22-24; Pl. Ex. 2 at 17-20). Officers Gill, Brockman and Boone each attended the Police Academy and receive continuing training through the Sheriff's Department. (Def. Ex. B at 4; Ex. D at 6; Ex. E at 5).


ANALYSIS

Excessive Force Claim Against Officer Gill

Defendants argue that, as a matter of law, Stone's excessive force claim against Officer Gill fails. To prevail on a Section 1983 claim, a plaintiff must show that he was deprived of a right secured by the Constitution or laws of the United States and that "the deprivation was caused by a person acting under color of state law." *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007).

Excessive force claims brought against law enforcement officers which stem from an arrest, investigatory stop, or other seizure of a citizen are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005).

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The question is whether the officers' actions are objectively reasonable in light of the facts

and circumstances confronting them, without
regard to their underlying intent or
motivation.

*Tibbs v. City of Chicago*, 469 F.3d 661, 665 (internal quotations

marks, brackets, and citations omitted). Specific facts to

consider in determining whether a police officer used excessive

force include the severity of the crime, whether the suspect posed

an immediate threat to the safety of the officer or others, and

whether the suspect was actively resisting arrest or attempting to

evade arrest by flight. *Graham,* 490 at 396.

With regard to the decision to utilize Dolar to apprehend

Stone, these factors weigh in favor of the Defendants. The vehicle

Stone was traveling in was stopped on suspicion that the driver was

driving while intoxicated. Stone immediately fled, and Officer

Brockman learned that he told the other occupants of the vehicle

that he would run if they were pulled over. He was located by

Officer Gill and Dolar and told to stop. Instead, he continued

fleeing, jumping over a fence. When he was located a second time,

he was warned that he needed to stop or Dolar would be released.

He still did not surrender. He continued to flee in a desperate

manner, causing the officers to reasonably believe he would

physically resist any attempt to apprehend him and could pose a

risk to the community. Under these facts, the decision to use

Dolar to apprehend Stone did not violate the Fourth Amendment. *See*

*Johnson v. Scott*, 576 F.3d 658, 660-61 (7th Cir. 2009)(finding no

excessive force where a suspect in a shooting engaged in vehicular flight and then fled on foot, even where the suspect encountered a fence that blocked his progress and surrendered moments before he was bit by the canine and struck by the officer); *see also Tilson v. City of Elkhart*, 317 F.Supp.2d 861 (N.D. Ind. 2003)(finding no excessive force where the plaintiff fled in his car and then by foot given the felony committed, threat to residents, and the resistance plaintiff displayed).

According to Stone, police dogs should be used to locate a suspect, but the officer should then call off the dog and have officers physically apprehend the suspect. He has produced no law supporting this assertion. Stone's suggestion, sometimes referred to as the "circle and bark" method of apprehension, may very well be a better policy. This Court, however, is tasked with deciding what is constitutional, not what is preferable. *See Jarrett v. Town of Yarmouth*, 331 F.3d 140 (1st Cir. 2003)(reversing a jury verdict based on the jury's belief that the bite-and-hold policy was unconstitutional, finding that the position "finds no support in the case law.").

Stone, however, alleges more than merely that the decision to utilize Dolar to apprehend him constituted excessive force. He alleges that Officer Gill's failure to call the dog off once he was subdued also constitutes excessive force. Here, there is a disagreement regarding the facts. Defendants assert that, once

Stone was handcuffed, the dog was removed.  Stone, however, has two witnesses that testified that, after Stone was handcuffed, the officers watched while the dog mauled Stone for a considerable period of time: they estimate five minutes.  On summary judgment, this Court cannot weigh the evidence and must accept the facts in the light most favorable to the non-moving party.  "It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders." *Johnson*, 576 F.3d 660 (citing *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001); *Priester v. Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000)).  If the facts presented by Stone are believed, a reasonable jury could find in Stone's favor on his claim that Officer Gill used excessive force by allowing the dog to continue to attack him after he was subdued.

Failure to Intervene by Officers Brockman and Boone

The Defendants argue that the excessive force claim fails as to Officers Brockman and Boone because there was no constitutional violation, they were not personally involved in the alleged constitutional violation, and they could not have intervened.  To succeed on a failure to intervene claim, a plaintiff must show that the officer was present, failed to intervene to prevent other law enforcement officers from infringing on his constitutional rights, had reason to know that a constitutional harm was being committed,

and had a realistic opportunity to intervene to prevent the harm from occurring. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

Because this Court has found that the decision to use Dolar to apprehend Stone was not an unconstitutional use of excessive force, Officers Brockman and Boone cannot be liable for failing to intervene in the canine apprehension of Stone.

As to the continued assault of Stone after being handcuffed, Officer Brockman cannot be liable for failing to intervene if she was not present and capable of intervening. There is, however, a question of fact regarding whether Officer Brockman was present at the scene when Stone was apprehended. While Officer Brockman asserts that Dolar had already been removed from Stone when she arrived at the scene of Stone's apprehension, Stone's witnesses place five officers at the scene watching him being attacked after being handcuffed. The record establishes that the officers involved in this incident included Officer Gill, Officer Brockman, Officer Boone, and Officer Hugunin.[2] When the facts and all reasonable inferences are considered in the light most favorable to Stone, this Court concludes that there is a question of fact regarding whether Officer Brockman was at the scene while Dolar was still attacking Stone.

Defendants also argue that Officers Brockman and Boone did not

_____

[2] Officer Hugunin is referenced repeatedly in Officer Brockman's deposition, although he is not a defendant in this case.

have an opportunity to intervene because only a trained canine handler may attempt to control a police canine. Further, no emergency existed that would warrant interference by an officer not trained as a canine handler. While the canine policy precluded any officer other than the canine handler from becoming involved in the use of a canine in the absence of an emergency, if a trier of fact believed Stone's witnesses, then the situation could be viewed as an emergency. When considering the facts in the light most favorable to Stone, this Court concludes that a reasonable jury could find that Officers Brockman and Boone had both an obligation and an opportunity to intervene.

Qualified Immunity

Officers Gill, Brockman, and Boone argue that they are entitled to qualified immunity because they reasonably believed the canine apprehension of Stone was lawful. "Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (citation omitted). "Whether a government official is entitled to qualified immunity is a legal question for resolution by the court, not a jury." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) (citations omitted). In determining whether an official is entitled to qualified immunity, a court asks two questions: "(1) whether the facts, taken in the

light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015) (citation omitted). "Although the privilege of qualified immunity is a defense, the plaintiff bears the burden of defeating it." *Betker v. Gomez,* 692 F.3d 854, 860 (7th Cir. 2012) (citation omitted).

Stone did not have a clearly established right to not be apprehended using a canine, and the officers are entitled to qualified immunity for actions related to the use of Dolar to apprehend Stone. However, Stone did have a clearly established right that he not be subjected to the continued use of force once subdued.

Defendants argue that "the contours of the Fourth Amendment with respect to canine apprehensions is [sic] not clearly established with respect to what occurs after apprehension." (DE #20 at 8). Defendants cite four separate cases to support this assertion, but none are persuasive.

The first case Defendants rely upon, *Crenshaw v. Lister*, utterly fails to support their position. *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009). The Court, in *dicta*, differentiates the case before it from one that involved a continuing attack after the suspect is secured, such as Stone has alleged:

> While it would have been objectively
> unreasonable for Lister to allow the canine to
> continue attacking Crenshaw *after* he was
> secured, *see Hadley*, 526 F.3d at 1130 ("Our
> cases hold that gratuitous use of force when a
> criminal suspect is not resisting arrest
> constitute excessive force."), Crenshaw does
> not allege that this occurred. Thus, under
> Crenshaw's version of the facts, there is no
> indication that Lister's use of the canine
> involved greater force than necessary or was
> in any way "malicious" or "sadistic."

*Id.* (emphasis in original). Because the use of the canine did not

constitute excessive force in *Crenshaw*, both the canine handler and

an officer that witnessed the attack and failed to intervene

received qualified immunity. *Id.* at 1293-94. Stone's allegations

more closely resemble the hypothetical considered in *Crenshaw* than

the facts before the court in *Crenshaw.*

In *Priester v. City of Riviera Beach,* another case relied on

by Defendants, the Eleventh Circuit denied qualified immunity to

both a canine handler and an officer that failed to intervene:

> Defendant Wheeler ordered and allowed his dog
> to attack and bite Plaintiff; threatened to
> kill Plaintiff when Plaintiff kicked the dog
> in an effort to resist the unprovoked attack;
> and let the dog attack Plaintiff for at least
> two minutes. Considering these facts, no
> particularized preexisting case law was
> necessary for it to be clearly established
> that what Defendant Wheeler did violated
> Plaintiff's constitutional right to be free
> from the excessive use of force. No
> reasonable police officer could believe that
> this force was permissible given these
> straightforward circumstances.

*Priester v. City of Rivera Beach*, 208 F.3d 919, 927 (11th Cir.

2000).  Officer Cushing, who was present at the time the dog attacked the plaintiff, fared no better:

> When we defer to the jury's implicit fact
> finding, the excessive force in this case was
> obvious and was such that every reasonable
> officer would have known that it was clearly
> in violation of Priester's constitutional
> rights.  Cushing observed the entire attack
> and had the time and ability to intervene, but
> he did nothing.  No particularized case law
> was necessary for a reasonable police officer
> to know that, on the facts of this case and
> given that the duty to intervene was clearly
> established, he should have intervened.

*Id.*

In *Mendoz v. Block*, the defendants made an argument similar to the Defendants in the instant case: that there are few cases addressing the use of police dogs to locate fleeing suspects, and the law is therefore not clearly established.  *Mendoz v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994).  In *Mendoz*, the court found that the use of a police dog to find Mendoz and secure him until he was handcuffed was objectively reasonable.  *Id.* at 1363.  In so finding, the court again differentiated between using a canine to locate and secure a suspect and using a canine after a suspect has been secured:

> The reasonableness of force is analyzed in
> light of such factors as the requirements for
> the officer's safety, the motivation for the
> arrest, and the extent of the injury
> inflicted.  This analysis applies to any
> arrest situation where force is used, whether
> it involves physical restraint, use of a
> baton, use of a gun, or use of a dog.  We do
> not believe that a more particularized

> expression of the law is necessary for law
> enforcement officials using police dogs to
> understand that under some circumstances the
> use of such a "weapon" might become unlawful.
> For example, no particularized case law is
> necessary for a deputy to know that excessive
> force has been used when a deputy sics a
> canine on a handcuffed arrestee who has fully
> surrendered and is completely under control.
> An officer is not entitled to qualified
> immunity on the grounds that the law is not
> clearly established every time a novel method
> is used to inflict injury.

*Id.* at 1362 (internal quotations and citations omitted). When considered in the light most favorable to Stone, this is precisely the scenario that is before this Court.

*Jarrett v. Town of Yarmouth* is no more helpful to Defendants than the preceding cases. *Jarrett v. Town of Yarmouth*, 331 F.3d 140 (1st Cir. 2003). A canine was used to apprehend Jarrett, biting him twice before the officer arrived and commanded the canine to release. A jury ruled in Jarrett's favor, but the court overturned the verdict. The court determined that the jury's verdict was based on a conclusion that the town's bite-and-hold policy was unconstitutional. The court determined that the policy was not in fact unconstitutional, and that Jarrett therefore suffered no constitutional injuries. *Id.* at 150-51. *Jarrett* did not involve allegations that the canine was permitted to continue to attack Jarrett after he was secured. *Id.* at 149.

Each of the aforementioned cases relied upon by Defendants confirm that qualified immunity is not appropriate on Stone's

claims that excessive force was used after he was secured. Stone has produced evidence that five officers stood with their arms crossed over their chests while he was handcuffed and laying on his belly and Dolar mauled him for several minutes. Stone has a clearly established right to be free from force of this nature unrelated to any legitimate law enforcement purpose. When "the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts" that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established. *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir. 1993). Qualified immunity does not extend to Officer Gill for the failure to remove Dolar after he was subdued.

Likewise, if the events happened as Stone alleges, Officers Brockman and Boone had an affirmative obligation to intervene to stop the alleged constitutional violation. Further, under Stone's version of events, the attack lasted sufficiently long that Officers Brockman and Boone had the time necessary to intervene. *See Priester,* 208 F.3d at 927.

The policy of the Sheriff's Department preventing officers from intervening with a canine in the absence of an emergency does not alter this analysis. If the unconstitutional mauling of a suspect by a dog for approximately five minutes after the suspect is secured does not constitute an emergency, then that word has

lost all meaning. Qualified immunity is denied to Officers
Brockman and Boone on Stone's claims that they failed to intervene
when Officer Gill allowed Dolar to continue attacking Stone
following his apprehension and handcuffing.


Municipal Liability

Defendants also assert that the Section 1983 claims against
the Sheriff's Department must be dismissed because Stone has no
evidence of any procedure, policy or practice that allegedly caused
his deprivation.[1]  A municipality may only be held liable for
constitutional violations caused by the municipality through its
own policy, practice, or custom. *Monell v. Dep't of Soc. Servs. of
the City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed.
2d 611 (1978).  To recover under *Monell*, a plaintiff must establish
that: (1) he suffered a deprivation of a federal right (2) as a
result of an express municipal policy, a widespread custom, or a
deliberate act of a decision-maker with final policymaking
authority for the municipality that (3) was the proximate cause of
his injury. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014).
"The existence of a policy or custom can be established in a number
of ways: the plaintiff may point to an express municipal policy

---

[1] Stone's claim against Sheriff Lain in his official capacity as Sheriff will be treated as a claim against the Sheriff's Department because "[a]n official capacity suit is tantamount to a claim against the government entity itself." *Guzman v. Sheahan*, 495 F.3d 852, 859 (citations omitted); *see McLaughlin v. Freeman,* No. 2:08-CV-58-PRC, 2013 WL 5407041, at *8 (N.D. Ind. Sept. 26, 2013) (holding that claims against Lake County Jail deputy warden in his official capacity were claims against the Lake County Sheriff's Department).

responsible for the alleged constitutional injury, or demonstrate that there is a practice that is so widespread that it rises to the level of a custom that can fairly be attributed to the municipality." *Id*.

Defendants argue that Stone's *Monell* claims fail because his underlying constitutional claims fail. As to Stone's claim that it was unconstitutional to apprehend him using the canine, this is correct. Stone's excessive force claims based on the attack continuing after he was secured and failure to intervene in that attack require further analysis.

Stone, however, has not pointed to a policy that caused this violation of his constitutional rights. Nothing in the policy provisions that Stone relies upon suggest that Sheriff Lain or the Sheriff's Department endorsed or approved of a policy of continuing to use force, canine or otherwise, against a suspect that has been subdued.

Stone argues that the use of force against him violated a provision of the use of force policy that provides that "[o]fficers shall not strike or use physical force against any person except when necessary in self-defense, in defense of another, to overcome physical resistance to lawful commands, or to prevent the escape of an arrested person." (Def. Ex. G at 1). He asserts that Stone's actions did not fall into any of these categories. According to Stone, fleeing does not constitute physical resistance. It is

unnecessary to parse out this language, because this policy was not a proximate cause of the violation of Stone's constitutional rights. The policy in no way indicates that allowing a canine to continue to attack a suspect after they have been handcuffed is permissible.

Stone further argues that, "under the canine policy, Officer Gill was required to apprehend any suspect no matter how minor the crime." (DE #29 at 10). According to Stone, this would be required for jaywalking, illegal parking, and littering. The policy states that "[t]he handler shall allow the canine to use only that level of force [that] is reasonably believed to be necessary to apprehend or secure a suspect." (Def. Ex. E at 17; Ex. H ¶ J). The policy simply does not require that canines be used to apprehend suspects involved in minor crimes or infractions. Furthermore, the constitutional harm at issue here is not the apprehension of Stone but the continuing attack after apprehension, and Stone cannot demonstrate a causal link between this policy and that harm.

Stone asserts that Sheriff Lain and the Sheriff's Department failed to adequately train its officers with respect to excessive force and the use of canines. In certain circumstances, a municipality's decision not to train employees about their legal duty to avoid violating citizens' rights may rise to the level of a municipal policy for purposes of Section 1983. *See Connick v.*

*Thompson*, 563 U.S. 51, 60–61 (2011)("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). To satisfy Section 1983, a municipality's failure to train its employees "must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id*. (citation and internal quotation marks omitted). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*. (internal quotations and citation omitted).

The evidence before this Court demonstrates that each of the officers involved graduated from the Police Academy. Further, Officer Gill and Dolar both received significant additional training. There is no evidence that the Sheriff's Department or Sheriff Lain failed to train employees adequately, or failed to respond adequately after learning of a pattern of constitutional violations. Stone has not addressed the failure to train claim in his response brief and it is therefore deemed waived. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003) (holding that a party abandoned his claim where he failed to delineate the claim in opposition to a motion for summary judgment); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented in response to a summary judgment motion are waived).

Stone has also failed to produce evidence of any custom or practice that resulted in the alleged constitutional violations. He points to no decisions by anyone, including Sheriff Lain, with final policymaking authority that resulted in his alleged constitutional violations. At best, Stone has alleged an isolated incident of misconduct by Officer Gill and an isolated incident of failure to intervene by Officers Brockman and Boone. *See Powe v. City of Chicago*, 664 F.2d 639, 650 (7th Cir. 1981). Accordingly, Stone's claims against the Sheriff's Department and Sheriff Lain in his official capacity fail.

Supervisory Liability

To the extent Stone intended to pursue a supervisory liability theory against the Sheriff's Department or Sheriff Lain, that claim cannot succeed. The doctrine of respondeat superior, or supervisory liability, does not apply to Section 1983 actions. *See Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000) ("However, § 1983 does not allow actions against individuals merely for their supervisory role of others.").

Sheriff Lain in his Individual Capacity

Stone's complaint alleges claims against Sheriff Lain in his individual capacity in addition to his official capacity. Defendants produced evidence that Sheriff Lain was not personally

involved in the apprehension of Stone. Stone offers no evidence to
the contrary. Because Stone does not proffer any admissible
evidence raising a genuine issue of material fact as to whether
Lain was personally involved in the alleged constitutional
deprivation, the Section 1983 claim against Lain in his individual
capacity must be dismissed. *See Palmer*, 327 F.3d at 594
(dismissing § 1983 claims against sheriff in his individual
capacity where plaintiff failed to make any showing that sheriff
was aware of the risk faced by plaintiff).


Fourteenth Amendment Due Process

Stone argues that Defendants failed to render prompt first aid
to him, in violation of his right to be secure from the depravation
of life, liberty or property without due process of law. U.S.
Const. Amend. XIV. Defendants have produced evidence to the
contrary, and Stone has offered no evidence in support of his
claim. Because he does not address this claim in his response
brief, it is deemed waived. *See Palmer*, 327 F.3d at 597–98; *Caruso*,
197 F.3d at 1197.


Declaratory Judgment

Stone seeks a ruling from this Court that the policies and
procedures of Sheriff Lain and the Sheriff's Department regarding
the deployment and use of dogs violates the Fourth and Fourteenth

Amendments, and an injunction barring the use and deployment of dogs to apprehend persons by attacking and biting except where there is probable cause to believe the person poses an immediate threat of serious physical injury or death to the officers or others. He also seeks an injunction against all use of dogs to assist in finding persons or taking them into custody until additional training occurs and policy initiatives are in place. A declaratory judgment action that addresses the same issues as the substantive claims serves no purpose. *Amari v. Radio Spirits, Inc.*, 219 F. Supp.2d 942 (N.D. Ill. 2002). Stone is unlikely to be subjected to another canine apprehension and concedes as much. A declaratory judgment will not remedy his past harms. Additionally, Stone has offered no argument in response to the Defendants' request that summary judgment be granted on his declaratory judgment claim. This constitutes a waiver. *See Palmer,* 327 F.3d at 597-98; *Caruso*, 197 F.3d at 1197. Accordingly, summary judgment will be granted on this claim.


CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment (DE #27) is **GRANTED IN PART** and **DENIED IN PART.** Summary judgment is **DENIED** on Jeremiah Stone's excessive force claim to the extent that it alleges that allowing the canine to continue attacking him following his apprehension constituted excessive force, and it is **DENIED** on his failure to intervene claim

against Officers Brockman and Boone.  Summary judgment is **GRANTED** as to all other claims.

**DATED: September 28, 2017**            <u>**/s/ RUDY LOZANO, Judge**</u>
                                         **United States District Court**